h WOODARD, Judge.
The defendant, the Sabine River Authority (the Authority), appeals the trial court’s award of $100,800.00 in general and special damages to the plaintiff, Sarah Derrick Crump (Crump). Crump sustained these damages because of the unauthorized construction of a canal, by a third party, on the Authority’s property, which is adjacent to Crump’s property. Crump answered the appeal, asserting that the trial court erred in not granting her injunctive relief and other damages. For the following reasons, we affirm, modify, and remand.
FACTS
After the creation of the Authority, pursuant to Act 261 of 1950, it began developing the Toledo Bend Reservoir Project in cooperation with its Texas counterpart, the Sabine River Authority of Texas. Created as an agency of the state with corporate powers equal to other public agencies and perpetual existence, the Authority was given vast powers over the Sabine River and its tributaries, including the power to control the waters within its jurisdiction and to develop and distribute hydroelectric power. La.R.S. 38:2324; La.R.S. 38:2325.
Rln the early 1960’s, Crump was the owner of sixty acres of land in Sabine Parish. As her tract of land in Sabine Parish lay partially within and partially without the boundaries of the reservoir; the Authority purchased the portion within the boundary in 1965 and leased back to Crüinp whatever portion lay between the boundary of the reservoir and the normal level of the lake.
Prior to the purchase by the Authority and the completion of the reservoir, McDonald Bayou meandered east and west across Crump’s sixty acres and into the Sabine River. When the purchase and lease-back con *765 tracts were completed, the south line of Crump’s lease-backed property was the north bank of McDonald Bayou. After the Toledo Bend Reservoir was completed, water began to back up onto the property she had sold to the Authority through McDonald Bayou and from what used to be the Sabine River. This occurrence gave her easy access to the Toledo Bend Reservoir. Since Louisiana Highway Six was nearby, Crump began making plans to build a mobile home park, boat houses, and a boat ramp. She named the area “Creek Bank on Toledo Mobile Camp Development.” Additionally, she spent $5,500.00 to have plans prepared for the development and for site completion.
Sometime around 1971, Crump noticed that two men, Lamar Haddox and R.V. Woods, were digging a canal across Authority land, which was in close proximity to her property. This canal was dug without any permit from, or even the knowledge of, the Authority. When completed, the canal intersected with McDonald Bayou on the east part of Crump’s property and with the reservoir on the west part of her property. Although the canal was abandoned shortly after its construction, it had the effect of altering the normal water flow of McDonald Bayou, thus cutting off Crump’s access to Toledo Bend Lake from her property.
After Crump discovered the alteration in the normal water flow, she notified Barton Rumsey (Rumsey), the Authority’s project engineer, and requested help in solving her problem. Crump periodically met with the Authority concerning the problem and its effect on her property, but initially the Authority did nothing. Between 1971 and 1992, both Crump and the Authority made efforts to correct the problem created by the canal, but with only temporary success. In 1989, Buddy Veuleman, a former shoreline manager for the Authority, had one end of the canal dug out in an attempt to restore the water flow; however, that provided only a temporary partial solution to the problem. In December of 1991, Harold Temple (Temple), the | gAuthority’s shoreline manager, assisted Crump by designing a new canal and dam in order to restore the water flow and course of McDonald Bayou. Once again, this .work proved to be only temporarily successful. In 1992, Crump had her problems placed on the Authority’s agendas, but in the end, the Authority elected to do nothing.
On December 21, 1992, Crump filed suit against the Authority, alleging that she spent over $50,000.00, attempting to correct the water flow problem, that the change in water flow has prevented her from developing her land, and that she has suffered extreme mental illness. She sought monetary damages and a judgment, ordering the Authority to remove or reconstruct the eanal. The negligent acts of the Authority were described as follows:
(1) By allowing individuals to dig a canal across property owned by the Sabine River Authority in a manner that caused harm to Ms. Crump by changing the water flow and course of the McDonald Bayou;
(2) By its failure to notice that a canal was being dug on its property;
(3) By its failure to require a permit for the construction of the canal;
(4) By its failure to enforce the regulations of the Sabine River Authority;
(5) By its failure to correct the problem of the eanal when it became aware of the problem;
(6) By its failure to manage its own property as required by law and-as required to protect private land owners having and owning land adjacent to the Toledo Bend Reservoir; and
(7) By its failure to use reasonable diligence in assisting Ms. Crump with her problem.
The Authority answered the petition and responded with exceptions of no cause of action and prescription. By judgment dated September 7,1997, the court overruled these exceptions and awarded Crump $50,800.00 for out-of-pocket expenses and $50,000.00 for mental anguish and frustration.
ASSIGNMENTS OF ERROR
In its original brief, the Authority asserts that the trial court erred when it overruled its (1) exception of prescription, and (2) exception of no cause of action. In 14its supple *766 mental brief, the Authority also questions whether (1) plaintiff carried her burden of proving damages, and (2) the award of damages was justified by the evidence.
In answering the appeal, Crump claims that the trial court erred when it failed to:
(1) Issue a mandatory injunction against the Sabine River Authority, ordering it to remove or reconstruct the canal and provide appellee with water access to her property from Toledo Bend and to restore the water flow and course of McDonald Bayoú to its original course and condition prior to the construction of the said canal.
(2) Award to her an amount of damages for the loss of use of her property and for her property’s decrease in value.
LAW
PRESCRIPTION
The Authority asserts that the trial court erred in failing to find that Crump’s claim had prescribed. It contends, specifically, that Crump’s injuries were not of a continuous nature so as to suspend the time for bringing her lawsuit, and that she had one year , from her discovery of the damage in which to file suit.
We disagree. The trial'court’s denial of the Authority’s exception of prescription is supported by the “continuing tort” theory, which states that prescription only begins to run when the wrongful conduct ceases. This theory was first addressed in South Cent. Bell Tel. Co. v. Texaco, Inc., 418 So.2d 531, 533 (La.1982), wherein the supreme court stated:
When the tortious conduct and resulting damages continue, prescription does not begin until the conduct causing the damage is abated.... Where the cause of the injury is a continuous one giving rise to successive damages, prescription dates from the cessation of the wrongful conduct causing the damage.
(Emphasis added.) In order tó prevail on a “continuing tort” theory, the plaintiff “must allege both continuous action and continuous damage.” Ready v. State of La., Dep’t of Health & Human Resources, 95-1564 (La. App. 3 Cir. 6/25/97); 707 So.2d 1250, 1256 (citations omitted).
RThe record clearly supports the application of the “continuous tort” doctrine to this case. The “continuous action” element of the doctrine is satisfied by the Authority’s contacts with Crump and repeated representations to her that it would resolve the water flow problem, as well as its unsuccessful attempts to do so. The “continuous damage” element is met because the unauthorized canal adversely affected Crump’s access rights and was never rectified.

Authority’s Contacts with Crump

The record establishes that the Authority had contact with Crump throughout the twenty plus years since it became aware of the illegal canal. Buddy Veuleman, who was the Authority’s shoreline manager from 1972-1990, testified that he noticed the illegal canal from the highway sometime in the early 1970’s and reported it to the' Authority. Veuleman supervised the first attempt to dam up the canal, paid for, in part, by the Authority. Barton Rumsey, a civil engineer, employed by the Department of Transportation and Development through the Authority, testified that sometime in the 1970’s he went to the site and “[w]e probably, we’re talking about years ago, told her that we would investigate the situation and look and see what it is and see what, if anything, could be done and we would refer it to the Board of Commissioners.” Rumsey was the one who finally recommended to Mrs. Crump that she get on the agenda of a Board meeting. Harold Temple, the Authority’s shoreline manager since July, 1991, stated that he was instructed to inspect and measure the eanal and the creek in the summer of 1995. Mrs. Crump remarked that she had constantly called, written, and met with anybody she could to try and fix the problem until the Board decided to take no further action.
The January 23, 1992 minutes of the Authority Board of Commissioners meeting show that Crump was physically present at this meeting and that Rumsey, the Authority’s project engineer, was the one who brought up Crump’s concern. The minutes *767 concerning that topic cover about one and one-fourth legal-sized pages, wherein the following excerpts could be reasonably interpreted as continuing assistance' by the Authority in the matter:
Mr. Rumsey referred to the information in front of each Board Member concerning Mrs. Sarah Crump.... Mr. Rumsey stated that Mr. Temple has worked with Mrs. Crump recently and there has been some more | (¡dredging done in the area which is believed to correct the problem_ Mr. Temple stated that since Mrs. Crump has produced this first letter to the SRA and has received a response, she was asking that the Board Members look into it, review it, and possibly see if there could be any reimbursement due to her because she has gone through considerable expenses over the years. Following a discussion, Mr. DeBarge moved, seconded by Mr. Van, that this matter be referred to Mr. Davis for recommendations to the Board as to SRA’s legal responsibility. Motion carried.
(Emphasis added.)
The February 19,1992 minutes of Authority Board of Commissioners meeting show that Crump was also physically present at this meeting and that Linda Curtis-Sparks (Curtis-Sparks), the Authority’s executive director, was the one who brought up Crump’s concern:
Mrs. Sparks stated that several of the Board members had requested that the legal recommendation on the Sarah Crump request, deferred from the January 23, 1992, regular board meeting, be put on this agenda and she referred to the copy of the letter from Mr. James L. Davis, which was placed before each board member. Mr. Geoghagan moved, seconded by Mr. Simmons, that the Committee adopt Mr. Davis’s recommendation. Motion carried.
A copy of a letter from James Davis (Davis) was attached to the minutes, wherein he recommended that the Authority “take no action, with respect to her request.”
The June 25, 1992 minutes of the Authority Board of Commissioners meeting show that Crump and her attorney were physically present and that Curtis-Sparks, again, referred to Davis’ letter. The Board then voted to use that letter “to correct shoreline violations.” (Emphasis added.) Crump’s attorney then addressed the Board, but the Board agreed with Davis’ opinion and “took no action.”
In sum, the record shows that Mrs. Crump had worked with the Authority over a period of twenty-five years and had attempted to resolve this problem with three different administrations. It is certain that Mrs. Crump tirelessly tried for years to work with the Authority, that the Authority had continuous communication with Mrs. Crump and continuous knowledge that there was. an unresolved problem, and that their actions could lead a reasonable person to believe that something would be done to rectify the situation. Mrs. Crump had no way of knowing that after twenty-five years, the Authority would decide that it had no obligation to correct the problem, and she ptook appropriate legal action within a year of learning that the Board refused to do anything.- Therefore, the trial court was correct to deny the prescription exception.

Authority’s Representations to Crump ■

The record also establishes that the Authority continued to make representations to Crump that it would solve the water flow problems. As aptly put by the trial court:
[W]hat Plaintiff did not know during all the delays over the years in her filing suit was that the Authority ultimately would fail to do anything to help her quest for restoration of access to the lake. The Authority continued to consider the problem year after year under circumstances which would lead a reasonable person to believe that help was at hand.
This conduct by the Authority, coupled with the continuing tort theory advanced by Plaintiff, causes the Court to conclude that the Defendant’s plea of prescription must be over-ruled.
(Emphasis added.)
Evidence in the record, substantiating the Authority’s continuing representations and participation are revealed, for example, in the trial testimony of Temple, the Authority’s shoreline manager. When asked if he had *768 some knowledge or some participation in the attempt to divert the water, he responded:
Yes, I did because she followed the procedure and applied for a permit and asked for information and questions as to the proper procedure and for recommendations and explained her situation and I looked at it from I guess a responsibility standpoint to help the public and use the benefit of what experience I had in the field by cheeking and I made a suggestion that that would be the logical thing to do, to close that off right there whereby that the water would travel through there and it would remain open and that would you know guarantee the maximum depth in the creek.
[[Image here]]
Yes, I did, I made regular trips down there during the work and the problem that occurred....
(Emphasis added.)
The trial testimony of Rumsey, the Authority’s project engineer, concerning how he responded to Crump’s concern, is also revealing:
IgThe very first time it would have to be “give us an opportunity to look at it and see what it is”. The second time my response to her probably would have been “hey, we looked at it, we see, here is what we visualize, here is what needs to be done ” and if it’s something, as her case is that we had no control. over correcting it would be that it needs to be referred to the Board. We have referred it to the Board. The Board chooses to take no action. The second or third calls “Ms. Crump, it would be better if you would come and present your case to the Board. I have explained the problem to them, you need to come talk to them yourself.”
(Emphasis added.) As noted above, he testified, “We probably .., told her that we would investigate the situation and look and see what it is and see what, if anything, could be done and we would refer it to the Board of Commissioners.” Additionally, Crump indicated in her brief that certain Authority employees helped by supervising the dredging.
The record further indicates that the Authority was continually aware of the problem and attempted to correct the problem in 1989, but was unsuccessful. The fact that Crump later, in 1991, tried to correct it herself, does not relieve the Authority of its ultimate responsibility. Its assistance to her during the latest endeavor in 1991 indicates its continued awareness of the problem.
The factual findings of the trial court are clearly supported by the record. Thus, because the tort sued upon is a continuous one, the Authority’s exception of prescription was properly denied.
Cause of Action
The Authority’s contention that Crump had no cause of action is also without merit. First, the Authority violated its own rules and regulations by allowing the unauthorized canal to exist on its property. As correctly observed by the trial court in its recitation of the facts: “The Authority promulgated rules and regulations for use of the lake’s shoreline, and all land owners were supposed to comply. However, enforcement of these rules and regulations by the Authority was often lax and haphazard during the early years.”' As a public body charged with the specific duty of managing the Toledo Bend Reservoir, its own land, and all adjacent land, the Authority had a clear duty to either prevent the construction of the illegal canal or to later have it removed after it was constructed. See Authority’s Official Manual of Policy, Rules |9and Regulations for Toledo Bend Dam and Reservoir § I (1.2, 2.1-2.4, and 3), § 11(3), § III (1967).
Second, the Authority interfered with Crump’s right to use the lease back area and to have access to McDonald Bayou and Toledo Bend Lake, as intended by the following contractual language in the lease back agreement:
(d) To construct and to maintain upon the leased property roads and paths to the water front to insure full and free ingress and egress thereto. The right of said ingress and egress being specifically granted herein.
[[Image here]]
*769 [T]he AUTHORITY will make no use of the property which will interfere in any way with the specific rights and privileges granted to LESSEE herein.
(Emphasis added.) It is also important to note that most of the language contained in the lease back agreement is taken, verbatim) from the Authority’s rules and regulations. See Authority’s Official Manual of Policy, Rules and Regulations for Toledo Bend Dam and Reservoir § III (2.1.D) (1967).
Thus, as stated in the trial court’s written reasons for ruling:
Defendant did owe a duty to Plaintiff. That duty was one of enforcing its own rules and regulations designed to prevent exactly what happened in the instant case. The language in the lease back agreement implies such a duty. Moreover, the conduct of the Authority in continuing to string Plaintiff along by holding meetings to look into her problem to see what could be done to correct it, was an implied assumption of a duty to her.
Clearly, this duty to Plaintiff was breached by the ultimate result which Plaintiff obtained — no enforcement by the Authority of its own rules and regulations, and no action by the Authority to resolve the loss to Plaintiff which resulted from its own inaction.
The Authority argues that since it as a government agency, it is to be afforded immunity for certain acts of discretion, pursuant to La.R.S. 9:2798.1(B), which provides that:
Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performaneé or the failure to Lpexercise or perform their policy making or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
However, La.R.S. 9:2798.1(B) is inapplicable in this case because the Authority’s inaction in this matter was not discretionary, given the duties described above.
Mandatory Injunction
Crump argues on appeal that the trial court should have issued a mandatory injunetion against the Authority, ordering it to either remove the unauthorized canal by filling it in or to reconstruct the unauthorized canal in such a way that the proper flow of McDonald Bayou will be restored to its original course and condition prior to the construction of the canal. We agree.
Although Crump requested this relief in her petition, the trial court did not address this demand in its judgment. Some action needs to be taken to restore the water flow. La.Code Civ.P. art. 3601 authorizes the issuance of an injunction “in eases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law....” Since Crump’s problem has not been remedied, and damage will definitely occur in the future, she is entitled to a mandatory injunction. See Freyou v. Iberia Parish Sch. Bd., 94-1371 (La.App. 3 Cir. 5/3/95); 657 So.2d 161.
In addition, requiring the Authority to act would not pose an unreasonable burden. When Rumsey, the Authority’s project engineer, was asked if the project would be “fairly expensive” he responded, “Not a whole lot, sir.” He testified that the mouth of the unauthorized canal could be closed off and the water would be restored to the original course for an amount between $10,000.00 and $50,000.00 by using a clay-type soil, mixed with pilings, fabric, or rocks and just building a quality dam across the canal’s mouth.
Damages
There is no error in the trial court’s award of damages. The construction of the unauthorized canal caused the portion of the bayou that ran along the southern portion of Crump’s property to recede such that no boat could be operated on the bayou. According to Crump’s testimony, the dredged canal “[jjust cut [McDonald Bayou] off | ncompletely. When it came down here, when it entered McDonald creek down here, it was lower and the water that came in from Toledo Bend went into the channel.”

Out-of-Pocket Expenses

Crump presented sufficient testimony to prove that she spent $50,800.00 in making improvements to her property, which depended on her ability to use the McDonald *770 Bayou to gain access to the Toledo Bend Reservoir and the Sabine River. Her expenditures, which are stipulated to by both parties, consisted of the following:
(1) $5,500.00 to S.M. Cothern, Civil Engineer, for the preparation and design of plans and specifications for the construction and development of a mobile home park on her property.
(2) $1,300.00 to Lynn Wooléy for the drilling and installation of a deep well and pump on her property for use by the mobile home park.
(3) $24,500.00 to S.L. Byrd for work that he did on improvements to her property.
(4) $1,500.00 to S.L. Byrd for dredging and cleaning an area of McDonald Bayou that intersected with the canal that had been dug across land adjacent to the bayou.
(5) $8,000.00 to O.L. Rogers, contractor, in December, 1991 for work done in an attempt to divert the flow of McDonald Bayou to its original course.
(6) $10,000.00 to O.L. Rogers, contractor, in 1980 and 1981 for work done in an attempt to restore the flow of McDonald Bayou to its original course.

Emotional Distress

In Louisiana, an award for emotional distress, resulting from property damage is allowed in limited situations: “1) by an intentional or illegal act; 2) by an act for which the tortfeasor will be strictly or absolutely liable; 3) by acts constituting a continuing nuisance; or 4) when the owner is present or nearby and suffers psychic trauma as a result.” Freyou, 657 So.2d at 163 (citation omitted).
These instances “were developed to insure that recovery for mental injury is allowed only when the injury, and its causal relation to the property damage, is clearly | ^established.” Blache v. Jones, 521 So.2d 530, 531 (La.App. 4 Cir.1988) (citation omitted). The property damage in this case, the unauthorized canal, has existed since the early 1970’s. Crump, understandably, endured anguish and frustration while patiently waiting for the Authority to act as promised. She testified that she had to make:
trips to the doctors for the headaches that [were] started as stress.
[[Image here]]
Well, this is the most stressful situation I’ve ever been in and so prolonged and it finally — I hate to admit ... but uh, it finally got to me to where I was having these terrible, terrible headaches and it was from stress ... it got so bad that — in fact I’ve just been to the Scott & White Clinic and three doctors says [sic] that your problem, lady, is stress.
She further testified that her last medication cost her “$2600.00 plus the trip.” As summed up by the trial court:
Despite repeated requests by Plaintiff that the Authority do something to restore her lake water access, the response by the Authority was all talk and no action.
This scenario went on and on for years, with Plaintiff always being patient and hopeful, and with the Authority holding meetings, and discussions, but never coming to any final conclusion.
(Emphasis added.) Accordingly, the trial court did not abuse its discretion in awarding Crump $50,000.00 for emotional distress.

Additional Monetary Requests by Crump on Appeal

On appeal, Crump argues that she should have been awarded damages for the loss of use of her property and for her property’s diminished value. We agree. She has been unable to develop her property, and hence, should be compensated. According to Crump’s testimony, she tried to develop her property commercially, but was unable to attract a developer because she no longer had regular access to Toledo Bend and the Sabine River via McDonald Bayou. Further, she testified:
| lilt's a problem that they created and I’ve tried every way that I know to correct it, and it really does hurt to think that I have to pay for it when they ... allowed it to be done, and as far as developing it at this moment there is no point in — well, I don’t think it would be a place to develop without access to the lake.
It does not matter that Crump could not establish with certainty the amount of dam *771 ages to which she is entitled. It is well settled that when it is clear that a plaintiff has suffered damages at the hands of a defendant, the plaintiffs inability to establish an exact amount will not preclude her demands. See Trans-Global Alloy Ltd. v. First Nat’l Bank of Jefferson Parish, 583 So.2d 443 (La.1991). The trial court’s judgment should be modified to include damages for Crump’s loss of use of her property and for its diminished value. We hereby remand the case to the trial court to determine the quantum “as best it can.... ” Id. at 456, quoting Brantley v. Tremont & Gulf Ry. Co., 226 La. 176, 75 So.2d 236 (1954).
CONCLUSION
For the foregoing reasons, we affirm the trial court’s general and special damage awards in Crump’s favor, but modify the judgment and remand, ordering the trial court to fix amounts for Crump’s loss of use of her property and for her property’s diminished value. Further, we hold that a mandatory injunction is to be issued against the Authority, as set forth above. All costs of this appeal are to be assessed against the Authority.
AFFIRMED, MODIFIED AND REMANDED.
PETERS, J.,'- dissents and assigns written reasons.